IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT LIVINGSTON, JR.,<br><br>        Petitioner,<br><br>v.<br><br>GURBIR S. GREWAL,[1] et al.,<br><br>        Respondents. | HONORABLE JEROME B. SIMANDLE<br><br>Civil Action<br>No. 12-5450 (JBS)<br><br>**OPINION** |

APPEARANCES:

Loly G. Tor, Esq.
Meghan Meade, Esq.
K&L Gates LLP
One Newark Center – 10th Floor
Newark, New Jersey 07102
    Attorneys for Petitioner Robert Livingston, Jr.

Angelo J. Onofri, Mercer County Prosecutor
Daniel A. Matos, Assistant Prosecutor
Mercer County Prosecutor's Office
P.O. Box 8068
Trenton, NJ 08650-0068
    Attorneys for Respondent Attorney General Gurbir S. Grewal

**SIMANDLE, District Judge:**

I.    **INTRODUCTION**

    This matter returns to the Court on mandate of the United States Court of Appeals for the Third Circuit that reverses in part this Court's denial of Robert Livingston, Jr.'s petition

---

[1] The Court substitutes Gurbir S. Grewal as Respondent as he became the New Jersey Attorney General on January 16, 2018. *See* Fed. R. Civ. P. 25(d).

for a writ of habeas corpus under 28 U.S.C. § 2254. The court of appeals granted a certificate of appealability on Petitioner's claim that the State of New Jersey violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to provide his trial counsel with the victim's criminal history. After concluding the state courts' decisions were contrary to established federal law by adding an admissibility requirement to *Brady*, the Third Circuit remanded to this Court for a decision on the merits of the *Brady* claim. *See Livingston v. Attorney Gen. New Jersey*, 722 F. App'x 301 (3d Cir. 2018).

The principal issue to be decided is whether the victim's criminal history would have been material to determining Petitioner's guilt at trial. After reviewing the record and supplemental submissions of the parties and hearing the arguments of the parties at oral argument on August 14, 2018, the Court finds Petitioner has not demonstrated a likelihood that the victim's criminal history would have been favorable to Petitioner nor material in that there is a reasonable probability its disclosure would have led to a different result. Therefore, Petitioner's *Brady* rights were not violated, and habeas relief is denied. The Court also denies a certificate of appealability.

## II. BACKGROUND

Petitioner is challenging a judgment of conviction filed in the Superior Court of New Jersey, Law Division, Mercer County, on February 6, 1998, and amended on February 23, 2001, after a jury found him guilty of second-degree passion/provocation manslaughter,[2] first-degree felony murder, first-degree robbery, third-degree possession of a baseball bat with a purpose to use it unlawfully, and fourth-degree unlawful possession of a baseball bat under circumstances not manifestly appropriate for its lawful use for his role in the death of Morris "Snoop" Lewis.[3]

One of Petitioner's arguments in his § 2254 petition was that his *Brady* rights were violated because the prosecutor failed to disclose Lewis's juvenile record in discovery. In response to a query from Petitioner's trial counsel about Lewis's criminal or juvenile history, the prosecution erroneously stated Lewis had none. In fact Lewis, who was 19 at the time of his death, had previously been adjudicated delinquent, pleading guilty to possession of a controlled dangerous substance with intent to distribute on or near school

---

[2] Petitioner was charged in Superseding Indictment 96-12-1432 with first-degree purposeful or knowing murder. ECF No. 17-2. The jury acquitted Petitioner of murder and found him guilty of the lesser included offense of passion/provocation manslaughter.
[3] As this matter has returned to the Court on remand and the parties are presumed to be familiar with the history of the case, the Court will only briefly address the facts necessary to today's decision.

property and to joyriding and was scheduled to have a pre-trial status conference on a receiving stolen property charge. *See Livingston*, 722 F. App'x at 302 n.2; *see also* ECF No. 17-7 at 17-18. He had also faced juvenile petitions for burglary, receiving stolen property, criminal trespass, criminal mischief, theft, possession of a controlled dangerous substance with intent to distribute on or near school property, tampering with evidence, and resisting arrest, none of which were adjudicated. *Id.* The state disclosed Lewis's record[4] to trial counsel after the jury rendered its verdict, and trial counsel included the alleged *Brady* violation in his motion for a new trial:

> If we had had the information that there had been a number of juvenile complaints involving drugs . . . but there was charges for aggressive behavior, resisting arrest, and some other things, the facts that some of those may have been dismissed as part of a plea bargain, at least we would have had the right to attempt to bring that information before the jury, to buttress Mr. Livingston's argument that he was merely reacting to an aggressive intruder in his own home at three o'clock in the morning.

Tr. of Feb. 6, 1998, ECF No. 17-32, 7:11-21. The trial court denied the motion, ruling:

> Rule 404(a)(2) of the New Jersey Rules of Evidence section (2) allows the introduction of evidence relating to the victim of a crime where evidence of a pertinent trait of character of the victim is offered by an

---

[4] Lewis's "record" was simply recapped in the prosecutor's post-trial brief addressing the defendant's motion for a new trial, (ECF No. 17-7 at 17-18), and no actual arrest records or related charging documents appear in the state court record or the record in the present § 2254 petition.

4

> accused. Evidence of the violent or aggressive character of the victim of an assaultive crime may be admissible on behalf of a criminal defendant to corroborate the defendant's account of the encounter if he claims that the victim was the aggressor, regardless of whether he then knew of that trait.
>
> . . . .
>
> In this case, none of the victim's arrests or charges on the juvenile petitions were for crimes of violence, assaultive behavior or offenses against the person. In sum, the victim was only adjudicated guilty of two offenses: specifically, Possession of a Controlled Dangerous Substance with Intent to Distribute on or Near School Property and Unlawful Taking of Means of Conveyance (Joyriding).
>
> The inadvertent failure of the State to provide this information would not have resulted in the discovery of any competent, admissible evidence on behalf of the defendant's claim of self-defense. This Court therefore does not find a <u>Brady</u> violation.

ECF No. 17-8 at 11-12. The Superior Court, Appellate Division affirmed on direct appeal.

On appeal from this Court's denial of Petitioner's § 2254 petition, the Third Circuit concluded the state courts erred by "characteriz[ing] admissibility as a 'separate, independent prong of *Brady*[.]'" *Livingston*, 722 F. App'x at 302 (quoting *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 310 (3d Cir. 2016) (en banc)).[5] It held that the trial court "erred in denying Livingston relief based on 'an additional element to the legal standard' that it improperly added, and the District Court, in

---

[5] The *Dennis* precedent came after this Court's judgment, but while the judgment was on appeal.

5

turn, erred in concluding that the state court did not violate clearly established federal law as defined by the United States Supreme Court." *Id.* at 304 (quoting *Dennis*, 834 F.3d at 280-81). It did not address the merits of the *Brady* claim.

The Court reopened the matter upon issuance of the mandate and appointed counsel[6] to represent Petitioner. The parties advised the Court they considered the *Brady* question to be a purely legal question that did not require further discovery. The Court ordered supplemental briefing and conducted a hearing consisting of oral argument on August 14, 2018, wherein neither party offered testimony or other evidence.

## III. STANDARD OF REVIEW

With respect to any claim adjudicated on the merits by a state court, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[6] The Court expresses appreciation to Petitioner's counsel for accepting this *pro bono* appointment and performing within the highest traditions of the bar.

6

28 U.S.C. § 2254(d). A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

The Third Circuit determined that the state courts' decisions were contrary to the Supreme Court's precedents in *Brady* and its progeny. *Livingston*, 722 F. App'x at 303-04. This Court is bound by that ruling, and traditional deference to the state courts' decisions under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply. The Court reviews the claim de novo. *See Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 849 (3d Cir. 2017) ("[W]hen a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred."), *as amended* (July 18, 2017), *cert. denied sub nom. Vickers v. Link*, 138 S. Ct. 685 (2018).

Petitioner Livingston bears the burden of "showing under § 2254(a) that he is being held in custody in violation of the

7

Constitution, laws, or treaties of the United States." *Mitchell v. Superintendent Dallas SCI*, __ F.3d __, No. 17-3118, 2018 WL 4016603, at *4 (3d Cir. Aug. 23, 2018) (precedential) (citing 28 U.S.C. § 2254(a)).

**IV. ANALYSIS**

The sole issue to be resolved by the Court is whether there was a *Brady* violation due to the State's failure to disclose Morris Lewis's criminal history. Petitioner must prove three elements to show a *Brady* violation: "First, the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching. Second, it must have been suppressed by the State, either willfully or inadvertently. Third, the evidence must have been material such that prejudice resulted from its suppression." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (internal citations and quotation marks omitted). "The 'touchstone of materiality is a "reasonable probability" of a different result.'" *Id*. at 285 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). The State concedes Lewis's criminal history was "inadvertently suppressed," meeting the second factor of the *Brady* test.[7]

---

[7] Although not determinative of the question of whether there was a *Brady* violation, the Court notes for the record that the parties agreed at oral argument that there was no evidence that the State intentionally withheld Lewis's record from Petitioner's trial counsel.

8

State's Brief, ECF No. 51, at 5. It denies the criminal history was favorable to Petitioner and that it was material.

In certain circumstances, Lewis's criminal record could be favorable and material to Petitioner's guilt or innocence. *See, e.g., Bridges v. Sec'y of Pa. Dep't of Corr.*, 706 F. App'x 75 (3d Cir. 2017) (suppressed police reports documenting witness's interactions with police were favorable and material); *United States v. Noble*, 251 F. App'x 792 (3d Cir. 2007) (government was obligated to provide evidence of witness's drug charges as it was favorable as impeachment evidence). However, Petitioner currently does not seek to use Lewis's record as impeachment evidence; indeed, since Lewis is deceased, his credibility or motivation to testify were not in question at trial. Additionally, Petitioner abandoned his prior position in his supplemental papers and at oral argument that Lewis's record was relevant to Lewis's propensity towards violence; indeed, Lewis was never arrested, let alone convicted, for a crime of violence. Instead, Petitioner argues the record is favorable and material because it would have supported his position that Lewis was an unknown burglar and not an invited guest.

The materiality question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

9

confidence." *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). *See also Smith v. Holtz*, 210 F.3d 186, 197 (3d Cir. 2000) ("Evidence 'is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (quoting *Bagley*, 473 U.S. at 678)).

In the present matter, Petitioner has adduced no evidence of the circumstances surrounding Lewis's juvenile arrest for the unadjudicated charge of "burglary." At the hearing, Petitioner's counsel asserted the mere labels of the juvenile records "brings a different side of Snoop to the forefront" and "could have armed his defense counsel with sufficient information at the time to canvas the community to try to learn more beyond was just in the actual records." Draft Tr. of Aug. 14, 2018 at 35:8-13. Trial counsel, of course, could have canvassed the neighborhood to learn about the victim even without the record, and his client's familiarity with Lewis and Lewis's acquaintance with Livingston's relative were all known at the time of trial. Defense counsel thus already had good reason to delve into Lewis's background if he wished to develop an unknown intruder theory of defense.

Moreover, the outcome of that juvenile petition for burglary is that it was dismissed, and no reason for the dismissal is known. Was it a misidentification of Lewis? Was the

proof strong or weak? What was there about that unadjudicated charge that would have been useful to the defense had it been disclosed?[8] What do the circumstances of the burglary suggest, if anything, about Lewis's *modus operandi*? Without knowing anything about the circumstances of Lewis's burglary arrest, the Court cannot say that it was information likely to be favorable to the defense. The Court is not persuaded that the undisclosed juvenile burglary arrest would undermine confidence in the verdict given the rest of the evidence against Petitioner. Petitioner has not met his burden of proof on the favorability and materiality prongs of the *Brady* test.

Petitioner does not deny killing Lewis. According to Petitioner's trial testimony, he was living in his father's house, on Cuyler Street in Trenton, New Jersey with his father's cousin in January 1995. Tr. of Oct. 16, 1997, ECF No. 17-28, 29:10 to 30:12. Petitioner claimed he knew Lewis from around the neighborhood "just to say hello, or what's up" but did not socialize with him because Lewis was much younger than him. *Id.*

---

[8] Furthermore, when the undisclosed list of Lewis's record came to light after trial and was argued in a post-judgment motion in 1998, as noted above, there was no record of the burglary petition, or any other charge, referred to by the parties, other than the mere listing of the two adjudicated charges and the other non-adjudicated charges state in the prosecutor's brief. *See* ECF No. 17-7 at 17-20. Thus, we cannot look to the 1998 record, nor any documents discovered in the 20 years since then, to discern what this "burglary" charge was, and what it was not.

at 32:1-9. On January 10, 1995, Petitioner's nephew, Lewis, and a third individual came to Petitioner's home to watch a boxing match on television. *Id.* at 33:1 to 34:5. At the end of the evening, everyone started to leave except Lewis who said he "don't have a home to go to." *Id.* 34:18. He asked to stay at Petitioner's home for the night. Petitioner initially said no, but relented when his nephew vouched for Lewis and Lewis offered to pay Petitioner $10 to stay the night. *Id.* at 34:19 to 35:3.

The next morning Petitioner and Lewis got into an argument because Lewis refused to leave when Petitioner asked. *Id.* at 36:3-24. Lewis offered Petitioner another $10 to stay, but Petitioner testified he refused the money. *Id.* Petitioner testified that as he returned home late on January 11, Lewis approached him on the street and told Petitioner that he did not have anywhere to stay the night. *Id.* at 38:3-8. Petitioner refused to let Lewis come back to his house. *Id.* at 38:8-13. Petitioner got home and lay down on the couch. *Id.* at 39:3-4. After a little while, Lewis knocked on Petitioner's door. *Id.* at 39:6-8. Petitioner told him to leave, and Lewis told Petitioner to "watch your car windows get bust and watch your house." *Id.* at 39:12-13. Petitioner called 911, but he changed his mind because he thought that would make the situation worse. *Id.* at 39:16-25. The 911 operator called back, and Petitioner told the

operator he had made a mistake. *Id.* at 40:1-3.[9] He then went to sleep on the couch in early hours of January 12. *Id.* at 40:6-7.

According to Petitioner's trial testimony, he was awakened by his alarm system sometime later and saw a silhouette of a person in the living room; he testified he did not know who it was at first. *Id.* at 40:11-25. Petitioner picked up a baseball bat and struck the intruder once. *Id.* at 41:2-3. He turned on the light, saw money in the intruder's hand, and identified the intruder as Lewis. *Id.* at 41:10-19.[10] Petitioner demanded to know why Lewis broke into his home and what he had stolen. *Id.* at 41:21 to 42:1. Petitioner tried to "push" Lewis out of the house with the bat, and Lewis struck Petitioner in the left eye. *Id.* at 42:4-8. Petitioner told the jury that Lewis jumped onto him and grabbed him, and Petitioner fought back with the bat. *Id.* at 42:10 to 43:13. After the fight was over, Petitioner took money from Lewis's underwear because "[his] philosophy was [Lewis] was going to rob [him]." *Id.* at 44:14-16. Petitioner then called 911

---

[9] On cross-examination, Petitioner admitted his first statement to police was inconsistent with this version. Petitioner told police he called 911 after hearing a noise at the back door but hung up after the noise stopped. He told the 911 operator that he was trying to dial 411. *Id.* at 175:10-18. He stated the version of events given at trial was the real version. *Id.* at 176:18 to 178:2.

[10] Petitioner's first statement to police indicated he "jumped up and started swinging a bat I had next to me. After I hit him a couple of times with the bat, I reached back and turned the light on. That's when I knew it was Snoop." *Id.* at 182:7-11.

13

to say there had been an intruder in his home and that the intruder was injured. *Id.* at 44:24 to 45:3. He told the 911 operator: "'Yeah, it was dark, and I kept beating him, and I'm – I'm so scared.'" *Id.* at 128:4-6. He testified he did not know Lewis was dead until the police told him. *Id.* at 45:10-12.

The State's theory was the Lewis was not an intruder, but a visitor known to Livingston. The State's blood spatter analyst testified Lewis could not have been wearing his shoes at the time of the fight. Tr. of Oct. 15, 1997, ECF No. 17-27, 54:22-25. In the expert's opinion, Lewis's shoes had to have been off based on the heel and transfer pattern of the blood. *Id.* at 55:16 to 56:3. However, Lewis's shoes were on his feet when the police arrived at Petitioner's house. Petitioner claimed Lewis's shoes came off in the struggle, and he put them back on Lewis after he called the police. Tr. of Oct. 16, 1997 43:4-6, 125:18-21. Similarly, the decedent was not wearing his jacket when police came, again suggesting he was a known visitor. Given Petitioner's inconsistent statements to police and the jury and the State's evidence presented at trial, the Court sees no reasonable probability that further investigation by defense counsel armed with knowledge of Lewis's record would have changed the jury's verdict. Without knowing anything about the circumstances of the prior burglary arrest, even upon the

present record, one cannot speculate that an investigation by defense counsel would have changed the course of events.

Petitioner essentially seeks to use Lewis's record as propensity evidence. In order to be favorable to the defense and material to Petitioner's guilt, more would need to be known about the specific circumstances of Lewis's prior arrest. The Court can imagine a scenario in which Lewis gained entry to his prospective burglary victims' homes by claiming he had no place to stay, using that opportunity to see where his unsuspecting hosts kept valuable items, how best to gain entry, and returning on later evenings to steal the items. Such a prior arrest for burglary might then have led to development of useful information to show Lewis's *modus operandi* and unquestionably put the arrest record into the category of evidence that needed to be disclosed to the defense. This is mere speculation, however. To be clear, this is not about whether Lewis's record would have been admissible at trial. Evidence need not be admissible to be material, but it does need to be non-speculative to enable this Court to opine that it is probable that further investigation by defense counsel would have led to exculpatory evidence. There is nothing in the record before the Court that provides any insight whatsoever as to the facts behind Lewis' burglary arrest that would enable the Court to determine how it benefits Petitioner.

The label "burglary" is not self-defining. At common law, burglary was defined as "breaking and entering another's dwelling at night with the intent to commit a felony." *Burglary*, Black's Law Dictionary 83 (10th ed. 2014). New Jersey's definition of burglary encompasses more actions, however. The jury charge given at Petitioner's trial was:

> A person is guilty of burglary if with purpose to commit an offense therein, he, one, enters the structures or a separately secured or occupied portion thereof, unless the structure was at the time open to the public, or the actor is licensed or privileged to enter, or surreptitiously remains in a structure or separately secured or occupied portion thereof, knowing that he is not licensed to do so.
>
> . . . .
>
> [S]tructure means . . . any building, room, place adapted for overnight accommodation.

Tr. of Oct. 23, 1997, ECF No. 17-30 at 42:18 to 43:1, 43:16-18. Lewis's prior burglary arrest applying New Jersey's broader statutory definition, could encompass a wide range of conduct irrelevant to this case. For example, under New Jersey law, the burglary need not occur at night and the actor could enter the premises lawfully but "surreptitiously remain" on the premises. All of this is simply to say that without more information about the precise circumstances of Lewis's prior burglary arrest, the mere label of "burglary" on his juvenile arrest record does not suggest Lewis was more likely to break into Petitioner's home.

16

Petitioner also briefly argues that Lewis's juvenile records could have been used to impeach the officers' testimony regarding the sufficiency of their investigation. In *Dennis*, the Third Circuit found documents showing that police did not "rigorously purse[]" an alternative suspect to be material under *Brady*. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 311 (3d Cir. 2016). Lewis was the victim, not an alternate suspect to Petitioner's crime and Lewis was not a witness. And once again, it is too speculative to say that the arrest records would have been beneficial without knowing the circumstances of the burglary arrest and subsequent dismissal of that charge.

Materiality is "not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Here, without any information about the specifics of Lewis's prior burglary arrest, the answer is no. Petitioner has not provided the Court with any facts to undermine confidence in the verdict. Simply put, Petitioner has not met his burden.

While one can speculate that disclosure of Lewis's record might have turned up something useful and material enough to affect the outcome, such a mere possibility does not satisfy Petitioner's burden. Petitioner, upon a fully-developed record, has failed to show "a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Smith v. Holtz*, 210 F.3d 186, 197 (3d Cir. 2000) (quoting *Bagley*, 473 U.S. at 678).

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right. As jurists of reason could not disagree with this Court's resolution of the claims, the Court shall deny Petitioner a certificate of appealability.

## V. CONCLUSION

For the reasons stated above, the habeas petition is denied. A certificate of appealability shall not issue.

An accompanying Order will be entered.

**September 5, 2018**                                **s/ Jerome B. Simandle**
                                                     JEROME B. SIMANDLE
                                                     U.S. District Judge